**MACH-TRONICS, INCORPORATED, a California corporation, Petitioner,**

v.

**The Honorable Alfonso J. ZIRPOLI, Judge of the United States District Court of the Northern District of California, Southern Division, Respondent.**
**No. 18349.**

United States Court of Appeals
Ninth Circuit.
April 1, 1963.

Duniway, Circuit Judge, dissented.

**12.** George Orwell, "1984."

Howard, Prim & Smith, Denis T. Rice, and Joseph L. Alioto, San Francisco, Cal., Wagstaffe, Daba & Hulse, Redwood City, Cal., for petitioner.

Pillsbury, Madison & Sutro, James Michael, Noel J. Dyer, Noble K. Gregory, William C. Miller and James F. Kirkham, San Francisco, Cal., for respondent and Ampex Corp., real party in interest.

Before POPE, BROWNING and DUN-IWAY, Circuit Judges.

POPE, Circuit Judge.

This is a petition for a writ of mandamus commanding the respondent Judge to vacate and set aside an order of October 16, 1962, which directed that all further proceedings in an action brought by the present petitioner against Ampex Corporation be stayed "until completion of all proceedings in the trial court" in an action pending in the Superior Court of the State of California, wherein Ampex Corporation is plaintiff and Mach-Tronics, Inc., the present petitioner, and others, are defendants.

The action in which further proceedings were thus stayed was commenced by the present petitioner on August 6, 1962, by the filing of a complaint against Ampex Corporation in the United States District Court for the Northern District of California, Southern Division. The complaint alleged that defendant Ampex and Radio Corporation of America had engaged and were engaged in a conspiracy to restrain and to monopolize interstate and foreign commerce in videotape recorders; that defendant had in fact achieved monopoly in violation of §§ 1 and 2 of the Sherman Act; that the

said conspirators agreed to certain acts in pursuance of the conspiracy involving the elimination of competition, the suppression of research and technological improvement, the cross-licensing of patents, the suppression of potential manufacturers of competitive equipment through threats of litigation and customer harassment, price fixing, division of markets, cartel agreements with foreign manufacturers, and otherwise; that the conspiracy and attempted monopolization was successful and resulted in monopolizing the video-tape recorder industry, raising prices, suppressing research and technical advances, discouraging new competition and impeding certain advances in television and other uses of video-tape recordings; and, in addition, that it injured the plaintiff in its business and its property. It alleged that the plaintiff, about May 1, 1962, successfully manufactured a low cost closed circuit video-tape recorder which threatened the monopoly position of the defendant and Radio Corporation of America; that the said conspirators combined to destroy the plaintiff by instituting litigation against plaintiff "falsely alleging that plaintiff had appropriated defendant's research and ideas"; that defendant had contacted plaintiff's potential customers and suppliers, falsely representing that the litigation referred to had been concluded in favor of the defendant, threatening them with economic reprisals if they dealt with the plaintiff, and that all of this was done by the conspirators to preserve their monopoly position pursuant to the aforesaid conspiracy.

The complaint alleged that by reason of the aforesaid acts the value of plaintiff's business had been diminished and its operation impeded and its good will threatened, all to the plaintiff's damage in the sum of $1,125,000. The prayer was for recovery of threefold the amount of these damages.

Approximately two months prior to the institution of petitioner's treble damage suit the defendant in that suit, here called Ampex, on June 8, 1962, filed an action in the Superior Court of the State of California in and for the County of San Mateo, against Mach-Tronics, petitioner here, and some eight individuals, alleged to be officers and employees of Mach-Tronics and former employees of Ampex.

The complaint in that action alleged that at the time the individual defendants were employed by Ampex, the latter was in the process of carrying on research and developing designs, confidential information and data for the purpose of producing portable video recorders; that it produced several prototypes of such recorders and planned others; that in connection with that research, the individual defendants had learned of these designs, confidential information and data, and that their intimate knowledge thereof had been acquired under circumstances imposing upon them a duty not to disclose the same; that notwithstanding this, the individual defendants in that action had left their employment with Ampex, organized Mach-Tronics, a California corporation, and in breach of trust disclosed to Mach-Tronics the confidential information possessed by them concerning the engineering, development and research of Ampex designed to provide a portable video-tape recorder. In short, the action by Ampex against Mach-Tronics and others in the state court was one for alleged unfair competition, breach of confidential relationship and wrongful appropriation of trade secrets.

In their answer to the amended Ampex complaint defendants denied the allegations of the complaint and particularly denied that the technical information utilized by Mach-Tronics in the development of a successful portable video-tape recorder had come from or originated with Ampex.[1] As a "separate and affirmative

1. The answer alleged that during the individual defendant's employment with Ampex the latter was engaged solely in developing a nonportable video recorder; that it had never undertaken engineering development, design, research, plans or specifications relating to portable video recorders; that such defendants left plaintiff "because of dissatisfaction with the unimaginative and inadequate engineering programs and policies which had come to characterize [Ampex]"; that

defense" it was alleged that Ampex was guilty of bad faith and unconscionable conduct by falsely stating to prospective purchasers from Mach-Tronics that Ampex had won this suit, by attempting to dissuade purchasers from dealing with Mach-Tronics, by disparaging the products and business of Mach-Tronics, and that Ampex "conspired and combined with other manufacturers and distributors unlawfully to restrain trade in video-tape recorders and related components, patented and unpatented, by such means as: division of markets; fixing and stabilizing of prices; cross-licensing of patents; and the institution of baseless litigation against defendants."

After petitioner's treble damage suit had been filed and it had initiated proceedings for the taking of depositions therein, Ampex, on September 17, 1962, moved to stay all further proceedings in that action pending final determination of the state court action mentioned. It was upon this motion that the respondent Judge acted in issuing the order of October 16, 1962, previously mentioned, and against which this petition for mandamus is directed.[2]

We note at the outset that the stayed proceedings were brought pursuant to the provisions of the Clayton Act § 4, 38 Stat. 731, 15 U.S.C.A. § 15, which permits such a treble damage action to be brought "in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy."[3]

It must be noted that in filing its complaint petitioner was presenting to the district court an action which that court was authorized to entertain, and one which was within the jurisdiction of that court. Initially the question is whether the respondent Judge, by granting the stay, could properly abstain from proceeding with the action or could properly prohibit the plaintiff in the action from proceeding with its prosecution.

The stay granted here goes far beyond the attempt of the court to fix or adjust its own calendar, or to postpone consideration of the case because of prior commitment of the court to cases having an earlier place upon its calender. By the order here in question the court withholds the further exercise of its authority until the state court might render a judgment. The court abandoned its control over and conduct of the case, including any placing of the case upon its calendar for trial. "It, therefore, appeared upon the record presented to the Circuit Court of Appeals that the Circuit Court had practically abandoned its jurisdiction over a case of which it had cognizance, and turned the matter over for adjudication to the state court. This, it has been steadily held, a Federal court may not do. * * * It cannot be denied that a Circuit Court of the United

Ampex commenced efforts to develop a portable video recorder after Mach-Tronics' successful MVR-10 was introduced.

2. The reasons stated for the stay were as follows:
"It is thus evident that any award of damages in this antitrust suit will be materially affected by the outcome of the State action. If the State court were to enjoin Mach-Tronics from manufacturing and selling the MVR-10 recorder and award Ampex damages for past sales, the injury to Mach-Tronics alleged in the present action would be substantially reduced, if not eliminated.
"Mach-Tronics has filed affidavits that it will be a minimum of a year from the filing of the memorandum to set in the State action on August 22, 1962 before that action can be brought to trial. The Court is satisfied, however, that a stay of the present proceedings until the State action is determined is of sufficient importance to the orderly administration of justice to outweigh any possible prejudice to Mach-Tronics."

3. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

States, like other courts, had power to postpone the trial of cases for good reasons, but by the orders made in this case the Federal court withheld the further exercise of its authority until the state court, by its action in a case involving all the parties, might render a judgment which would be res judicata, and thus prevent further proceedings in the Federal court." McClellan v. Carland, 217 U.S. 268, 281–282, 30 S.Ct. 501, 504, 54 L.Ed. 762. The court was undertaking to make use of and apply the so-called doctrine of abstention.

■ It has long been recognized that when a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. Willcox v. Consolidated Gas Co., 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382; Meredith v. City of Winter Haven, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9; Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480; Allegheny County v. Frank Mashuda, 360 U.S. 185, 188–189, 79 S.Ct. 1060, 3 L.Ed. 2d 1163. It has also been considered to be the rule that when a federal court is presented with a case of which it has cognizance it may not turn the matter over for adjudication to the state court, and that the pendency of an action in the state court is no bar to the proceedings concerning the same matter in the federal court. McClellan v. Carland, supra, 217 U.S. pp. 281–282, 30 S.Ct. 501.

■ It has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide even questions of state law when necessary to the rendition of a judgment. Meredith v. City of Winter Haven, supra. A fortiori it would appear to be the duty of the federal courts to decide cases and questions arising under federal statutes such as the Sherman Act.

■ This undoubted obligation of a federal court to proceed to hear and dispose of a case properly before it is subject to the rule that in certain exceptional cases a federal court may properly abstain from proceeding in or deciding cases within its jurisdiction in order to permit the parties to repair to the state court for adjudication of certain matters involved in the case pending before the federal court. This we noted in Marshall v. Sawyer, 9 Cir., 301 F.2d 639, 645, where we said: "The avoidance of the obligation of federal courts to decide cases in which they have jurisdiction can be justified under the doctrine of abstention 'only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.' County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 3 L.Ed.2d 1163."

The Supreme Court case thus cited by us in the Marshall case is in line with earlier decisions of the Supreme Court to the effect that abstention by a federal court, pending the determination of special issues in the state court, is appropriate only under exceptional circumstances, and in the absence of special circumstances, it is not to be used to impede the normal course of action where federal courts have been granted jurisdiction of the controversy. Propper v. Clark, 337 U.S. 472, 492, 69 S.Ct. 1333, 93 L.Ed. 1480.

Perhaps the leading case outlining the conditions under which abstention is proper is Railway Comm. of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. It has often been cited as representing the typical case where abstention would be appropriate.[4] In that case the Texas Railroad Commission had made an order that no sleeping car should be operated on any line of

---

4. The most recent cases in accord with the Pullman case are the following: Two Guys, etc. v. McGinley, 366 U.S. 582, 589, 81 S.Ct. 1135, 6 L.Ed.2d 551; Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186; Harrison v. N.A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Meridian v. Southern Bell T. & T. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed. 2d 562; there are numerous others.

railroad in the State "unless such cars are continuously in charge of an employee * * * having the rank and position of Pullman conductor." The Pullman company and the railroads sued in the federal court to enjoin the Commission's order and Pullman porters intervened as complainants. In support of the action it was asserted (1), that the order was unauthorized by Texas law; and (2), that it was violative of the equal protection, due process and commerce clauses of the Constitution. The porters added to these contentions the assertions that the order was a discrimination against Negroes in violation of the Fourteenth Amendment. The Commission found justification for its order in a Texas statute conferring certain powers upon the Commission. The court found that the meaning of the Texas statute was "far from clear" and that what the Commission was permitted to do in a regulatory matter was equally doubtful.

The three-judge court which heard the case enjoined the enforcement of the order of the Commission. On appeal the Supreme Court remanded the case to the district court with directions "to retain the bill pending a determination of proceedings, to be brought with reasonable promptness, in the state court in conformity with this opinion." The opinion was to the effect that the directed abstention should be for the purpose of permitting a determination through appropriate proceedings in the state courts as to the meaning and interpretation of the state statute.

It is noteworthy that abstention was justified in this case because of several circumstances. The first was the existence of a substantial constitutional issue. The court noted that, "If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation." It was noted also that the proceeding in the district court was one in equity; and that historically an appeal to the Chancellor was an appeal to the "exercise of the sound discretion, which guides the determination of courts of equity"; and it was stated that that discretion historically could take account of "public consequences in employing the extraordinary remedy of the injunction." It was noted that involved also was a matter of state policy having to do with a regulatory law of the state; and then there was the factor of uncertainty of the meaning of the state statute. The adjudication in the state court to which reference was made might well dispose of the whole controversy.[5]

As time went on the Supreme Court found other instances in which abstention was deemed to be proper or appropriate, even where no constitutional issue was present.[6] And recently, on June 8, 1959, the Supreme Court handed down four more decisions dealing with the problem of abstention. Three of these, Martin v. Creasy, supra, Harrison v. N. A. A.

5. The suggestion that the district court by waiting for the decision in the state court might avoid having to pass upon the constitutional question, would appear to have behind it the same reasoning which leads to the doctrine that the court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." See the concurring opinion of Mr. Justice Brandeis in Ashwander v. T.V.A., 297 U.S. 288, 347–348, 56 S.Ct. 466, 80 L.Ed. 688. Mr. Justice Frankfurter made specific reference to this rationale in Clay v. Sun Insurance Office, 363 U.S. 207, 211, 80 S.Ct. 1222, 4 L.Ed.2d 1170.

6. These were cases which involved problems of comity with the states, where important state policies were sought to be implemented under state law, and where an injunction against state officers might result in needless friction with state policies. Illustrations of the application of this rule are to be found in Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, and in Alabama Public Service Comm. v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002. "These questions of regulation of the industry by the state administrative agency, whether involving gas or oil prorationing programs or Rule 37 cases, so clearly involve basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them." (319 U.S. at 332, 63 S.Ct. at 1106.)

C. P., supra, and Allegheny County v. Frank Mashuda Co., supra, are referred to above. The fourth was Louisiana Power & Light Co. v. Thibodaux City, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058, which would appear to carry the permissible limits of abstention further than any prior decision. That was an eminent domain proceeding in which the City sought expropriation of certain property of the power and light company in a Louisiana court. The case was removed to the United States District Court on the basis of diversity of citizenship. The district court ordered proceedings stayed "until the Supreme Court of Louisiana has been afforded an opportunity to interpret Act 111 of 1900 [LSA–R.S. 19:101 et seq.]," which was the authority on which the city's expropriation order was based. The Court upheld this action of the district judge reversing the contrary decision of the Court of Appeals.[7]

It was the view of the Court that the state statute was, as Mr. Justice Stewart said in his concurring opinion, "of highly doubtful meaning." The key sentence in the opinion was as follows: "We have increasingly recognized the wisdom of staying actions in the federal courts pending determination by a state court of decisive issues of state law."[8]

The most extreme view that can be taken of the Thibodaux City case is that it simply holds that actions in the federal courts are properly stayed in any case "pending determination by a state court of decisive issues of state law" where the controlling statute is of highly doubtful meaning.

When we undertake to apply all of the declared rules relating to abstention to the facts of the case here present, we must conclude that none of the various. suggested bases for abstention can be found here. There is no constitutional question presented which might suggest application of the rule in the Pullman case, supra. This is not a case in which action by state regulatory officers is sought to be enjoined, and where such

---

**7.** It noted that "eminent domain is a prerogative of the State." (p. 26, 79 S.Ct. p. 1071) "The fundamental fact is that eminent domain is a prerogative of the State, which on the one hand may be exercised in any way that the State thinks fit, and on the other hand may not be exercised except by an authority which the State confers." This was held to be a "relevant and important consideration in the appropriate judicial administration of such actions in the federal courts." The Court noted that the Louisiana statute referred to in the district court's order had never been interpreted; that the attorney general of Louisiana had in a similar case ruled that a Louisiana city did not have the power here claimed by the city; and that it considered that the experienced district judge may have found himself in a "quandary" about the power of the city.

**8.** The Court noted that the prior cases involving abstention by the district court had been founded in equity. "The cases mentioned above where this Court required submission of single issues, excised from the controversy, to state courts were cases in equity." Propper v. Clark, 337 U.S. 472, 491, 69 S.Ct. 1333, 1344. It is at least suggested in the opinion that

the Court considered that an eminent domain proceeding should be treated in the same category as a case in equity, and that such a proceeding "is of a special and peculiar nature" and that "it is intimately involved with sovereign prerogative."

This is by no means clear. On the same day the Supreme Court in Allegheny County v. Frank Mashuda, supra, a case involving the district court's diversity jurisdiction in a state eminent domain case, held that abstention was improper, and that that doctrine was appropriate only in exceptional circumstances none of which appeared in that case.

The Supreme Court's decisions in these four cases, all decided on the same day,. and particularly its decision in the Thibodaux City case, supra, seem to have prompted a number of law review articles. dealing with the doctrine of abstention. All of these have noted the seemingly new problems suggested by the Louisiana Power and Light Company case. See Wright, "The Abstention Doctrine Reconsidered", 37 Texas L.Rev. 815; "Abstention; An Exercise In Federalism", 108 U.Pa.L.Rev. 226; "Judicial Abstention From The Exercise of Federal Jurisdiction", 59 Colum.L.Rev. 749.

officers are acting in carrying out a complicated state regulatory system of local law. In other words, none of the features of Burford v. Sun Oil Co., supra, or of Alabama Public Service Comm. v. Southern R., supra, are to be found in this case. The treble damage suit is not one in equity or comparable to a suit in equity. It is an action at law. Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505. There is no need for determination of the meaning of state law, either statutory or decisional. There is no danger here of any collision with any state public policy or any problem of interference by the federal court with any "proper and validly administered state concerns", such as noticed in Harrison v. N. A. A. C. P., supra. No state official is a party to the proceeding, much less has any representative of the state suggested abstention in the interest of comity.[9]

Here taking both the case in the federal court and the case in the state court, we can find nothing for decision in either case except questions of fact. There cannot be any suggestion that there is any doubt as to state law. The Supreme Court has always held that where the state law is clear and readily ascertained there is no basis for abstention. Chicago

v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 84, 78 S.Ct. 1063, 2 L.Ed.2d 1174; Toomer v. Witsell, 334 U.S. 385, 392, footnote 15, 68 S.Ct. 1156, 92 L.Ed. 1460.

We are compelled to reach the conclusion that there is no basis in law for application of the abstention doctrine in this case. When we inquire whether under the facts here present there is any single reason which the Supreme Court has previously approved as a basis for abstention the answer is completely and wholly negative. This alone is sufficient to require the issuance of mandamus here.

But there are other reasons, positive in character, which make clear the impropriety of the issuance of the court's stay. In some of the Supreme Court decisions holding abstention appropriate or required, the Court has noted that there was involved in the particular case disposition of certain matters relating to the state's public policy, or matters in which the state had a definite public interest. Such a case was Burford v. Sun Oil Company, supra, where the Court said that the trial court might, although it had jurisdiction, refuse to enforce certain legal rights "the exercise of which may be prejudicial to the public

9. The situation here is the same as that which was described by the Supreme Court in Allegheny County v. Frank Mashuda Co., supra, 360 U.S. at p. 189, 79 S.Ct. at p. 1063, as follows: "This Court has sanctioned a federal court's postponement of the exercise of its jurisdiction in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law. See, e. g., City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639 [79 S.Ct. 455, 3 L.Ed.2d 562], (citing many cases). But there are no federal constitutional questions raised in this case.

"This Court has also upheld an abstention on grounds of comity with the States when the exercise of jurisdiction by the federal court would disrupt a state administrative process, Burford v. Sun Oil Co., 319 U.S. 315 [63 S.Ct. 1098, 87 L. Ed. 1424]; Pennsylvania v. Williams, 294 U.S. 176 [55 S.Ct. 380, 79 L.Ed. 841], interfere with the collection of state taxes,

Toomer v. Witsell, 334 U.S. 385, 392 [68 S.Ct. 1156, 92 L.Ed. 1460]; Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293 [63 S.Ct. 1070, 87 L.Ed. 1407], or otherwise create needless friction by unnecessarily enjoining state officials from executing domestic policies, Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341 [71 S.Ct. 762, 95 L.Ed. 1002]; Hawks v. Hamill, 288 U.S. 52 [53 S.Ct. 240, 77 L.Ed. 610]. But adjudication of the issues in this case by the District Court would present no hazard of disrupting federal-state relations. The respondents did not ask the District Court to apply paramount federal law to prohibit state officials from carrying out state domestic policies, nor do they seek the obvious irritant to state-federal relations of an injunction against state officials. The only question for decision is the purely factual question whether the County expropriated the respondents' land for private rather than for public use."

interest." The Court went on to say (319 U.S. at 318, 63 S.Ct. at 1099): " * * * it 'is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.' " [10]

This same regard for state public policy runs through many of the Supreme Court decisions. Thus in the Pullman case, supra, the Court said: "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies * * *." (312 U.S. p. 500, 61 S.Ct. p. 645.)

In the case before us we have no problem dealing with any state public policy such as those mentioned in the cases above mentioned. As we shall note hereafter, neither the case pending in the state court nor the case commenced by petitioner in the federal court involves anything other than the determination of a question of fact. Here, in contrast to the cases just referred to, where the controlling and important public policy is a state public policy, it is a federal public policy which is of primary importance, a policy which has to do with the Congress's provisions for enforcement of the anti-trust laws.

■ When Congress passed the Sherman Act in 1890, it incorporated as § 7 the predecessor of what is now § 15 of Title 15 U.S.C. (26 Stat. 210). The provision for the recovery of treble damages by an injured party was an important and significant feature of the entire anti-trust program. We had occasion to note this in Karseal Corporation v. Richfield Oil Corporation, 9 Cir., 221 F.2d 358, 365: "The treble-damage action was intended not merely to redress injury to an individual through the prohibited practices, but to aid in achieving the broad social object of the statute." [11]

The legislative history of the predecessor of § 15 discloses that there was doubt as to whether state courts could be depended upon to award treble damages. This is doubtless one of the reasons why jurisdiction to enforce these rights was vested in the federal district courts,[12] which jurisdiction has been said to be exclusive.[13]

■ Another federal public policy which stems from the provisions of the Seventh Amendment is exemplified by the Court's decision in Beacon Theatres v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988. There the Court said (p. 504, 79 S.Ct. p. 953): "It follows that if Beacon would have been entitled to a jury trial in a treble damage suit against Fox it cannot be deprived of that right merely because Fox took advantage of the availability of the declaratory relief to sue Beacon first." The Court noted that the right to trial by jury applies to treble damage suits under the anti-trust

---

10. The language just quoted was taken from Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841.

Involved in the Burford case was an important Texas policy implemented by massive provisions for regulating the extraction of oil from oil pools. See the statement quoted supra, footnote 6.

11. See also Flintkote Company v. Lysfjord, 9 Cir., 246 F.2d 368, 398:

"The treble damage provision was designed to foster and stimulate the interest of private persons in maintaining a free and competitive economy. Its efficacy should not be weakened by judicial construction."

12. On April 18, 1890, Senator Reagan of Texas offered an amendment to § 7 adding: "or in any state court of competent jurisdiction." 21 Cong.Rec. 3146. Senator Hoar said that it would be unconstitutional to give state courts the power to enforce the penalty. Ibid. The Reagan amendment was rejected. 21 Cong.Rec. 3151.

13. Blumenstock Bros. Advertising Agency v. Curtis Pub. Co., 252 U.S. 436, 440, 40 S.Ct. 385, 386, 64 L.Ed. 649, referring to the predecessor § 7: "The action is wholly statutory, and can only be brought in a District Court of the United States * * *." And see Freeman v. Bee Machine Co., 319 U.S. 448, 451, (footnote 6), 63 S.Ct. 1146, 87 L.Ed. 1509. Also General Inv. Co. v. Lake Shore Ry., 260 U.S. 261, 286–287, 43 S.Ct. 106, 67 L.Ed. 244, and Banana Distributors, Inc. v. United Fruit Co., 2 Cir., 269 F.2d 790, 793.

laws and stated that this right "is, in fact, an essential part of the congressional plan for making competition rather than monopoly the rule of trade * * *."

In the Beacon case the first action for declaratory relief was brought in the federal court. The treble damage counterclaim followed. Behind the mandamus proceeding to compel the district judge to vacate certain orders, under which he would have tried an equitable proceeding first, involving the determination of fact questions as to whether there was substantial competition between two theatres, was the fear by the party claiming the treble damages that the court's determination of that issue would become res judicata for the purposes of the antitrust counterclaim. See Dairy Queen v. Wood, 369 U.S. 469 at 472, 82 S.Ct. 894 at 896, 8 L.Ed.2d 44. If, as the court held, what was attempted to be done in that case would operate as a denial of "an essential part of the congressional plan", how can we avoid saying here that to give primacy to the trial of the state court case and the determination there of the issues bearing upon possible antitrust violations would fly in the face of congressional purpose both to provide a recovery of treble damages and to have that issue tried by jury in the federal court? [14]

We note that the final outcome of all this litigation is going to turn upon findings of fact which, as we have indicated, petitioner asserts should come from a jury verdict, for it has demanded trial by jury. Only when all those facts have been resolved will it be possible for the court to ascertain whether Ampex or Mach-Tronics is in the right. Plainly the theory of Ampex is that a former trusted employee or employees in violation of their trust obligations stole Ampex's trade secrets, designs and confidential information and data relating to the production of portable video recorders. No doubt when Ampex comes to answer the treble damage complaint it will undertake to assert that Mach-Tronics' allegations of conspiracy to monopolize or to destroy competition are no more than something contrived for the purpose of trying to defend against or escape from the consequences of this abstraction of secret information.[15]

On its part, Mach-Tronics and its employees assert that when the employees were working for Ampex, the latter was engaged solely in developing a non-portable video-tape recorder; that Ampex was not engaged in developing a portable video-tape recorder; and that these employees left Ampex "because of dissatisfaction with the unimaginative and inadequate engineering programs and policies which had come to characterize [Ampex]." The present president of Mach-Tronics is alleged to have left Ampex on October 3, 1961, after having given notice in early July, 1961, of his intention to leave.

Mach-Tronics claims that all of the investigation, study and development work which led to the production by it of the MVR-10 were conducted by Mach-Tronics and its employees after they had no longer any connection with Ampex and it was at that time that these researchers produced the first low cost lightweight truly portable closed circuit video-tape recorder designed to be successful and competitive with other video-tape recorders.

Mach-Tronics asserts that prior to December 1, 1961, Ampex and RCA had engaged in a conspiracy to eliminate competition in the manufacture and distribution of video-tape recorders, specifying

---

14. The suit by Ampex against Mach-Tronics purports to be a suit in equity seeking an injunction. It is alleged that "Ampex has no adequate remedy at law in the premises and requires the aid of a court of equity in order that defendants may be enjoined and restrained", etc. The allegation of damages is apparently incidental to the proceeding for equitable relief.

15. Apparently this was the view of Judge Walsh prior to the time mandamus was issued against him in Lyons v. Westinghouse Electric Corporation, 2 Cir., 222 F. 2d 184. Judge Walsh said: "Especially is this true when the antitrust charge was an apparent retaliation to a proceeding to recover for false accounting." (Lyons v. Westinghouse, D.C., 16 F.R.D. 384, 385.)

in some detail the terms and manner of carrying out that conspiracy; that the effect of the conspiracy was to procure monopolization in this field; that after Mach-Tronics had successfully manufactured a low cost portable closed circuit video-tape recorder from a conception and design of its own employees this threatened the monopoly position of the defendant, whereupon the defendant and RCA combined to destroy Mach-Tronics and drive it from the market and that as a part of the effort to do so Ampex instituted its suit above referred to in the state court and proceeded to notify Mach-Tronics' customers and suppliers that the litigation had been decided in favor of Ampex threatening them with economic reprisals if they dealt with Mach-Tronics.

It seems plain to us that which of these two versions of the facts in these cases is the true and correct one can only be ascertained after trial. The question here is whether the respondent court may abstain and refrain from trying and hearing any of the issues sought to be presented to it until after the state court has decided the case pending there.

One aspect of some of the cases upholding abstention has been that through abstention until after certain issues have been determined in the state courts it may come about that the decision in the state courts may render further action in the federal court wholly unnecessary. Thus in most cases in which the constitutionality of a state statute is questioned, the determination of the state court as to the meaning of the statute may well mean that the portions of the statute which are under attack will be disposed of by the state court's construction of the statute in such manner as to avoid the features objected to. Thus the federal court might never be

required to pass upon the constitutional issue.

We think that here in any event the federal court must sooner or later determine the issues presented by the treble damage complaint. We do not see any way in which the respondent could avoid coming to grips with the contention made in the treble damage complaint that the action was brought in the state court for the purpose of giving effect to Ampex's unlawful monopolistic scheme. Even if it were to be found that Mach-Tronics and its employees have been guilty of stealing the secrets and processes of Ampex, that would not avoid or otherwise dispose of Mach-Tronics' treble damage case if the latter succeeds in establishing these allegations of its complaint.[15a]

In this respect the case is very similar to Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416. In that case the court found that Kobe was the owner of certain patents some of which were valid and infringed by Dempsey whom it had sued for infringement. However, the court held that Kobe was guilty of unlawful monopolization under the Sherman Act and awarded Dempsey treble damages. Kobe had long been in the business of manufacturing pumps and had acquired patents relating to such pumps. Later Dempsey began to produce hydraulic pumps and Kobe learned that Dempsey was receiving requests for information concerning its pump. Kobe notified Dempsey of its claim of infringement by Dempsey and demanded that Dempsey discontinue its activities. A letter from Kobe went to the pump equipment customers stating: "It is our obligation to inform you of this pending infringement action." As a result of the suit and the notices the activities of Dempsey were almost at a standstill.

15a. The complaint alleges: "The said litigation was brought to harass plaintiff, to force it to make substantial litigation expenditures, to divert it from the business of manufacturing and selling its MVR–10, and to force it into bankruptcy. In addition thereto, defendant has contacted plaintiff's potential customers and suppliers, falsely represented that the courts had decided the foregoing litigation in favor of defendant, and threatened them with economic reprisals if they dealt with plaintiff, again with the intent of forcing plaintiff into bankruptcy. All of this has been done by defendant and RCA to preserve their monopoly position pursuant to the conspiracy herein alleged."

The court affirmed the trial court's conclusions that Kobe had carried on its business in violation of the provisions of the Sherman Act which would prevent Kobe's recovery for an infringement of their patents and make them liable for the damages resulting from such violation. The court said (p. 425): "The result of Kobe's infringement action, its verbal and written statements to the trade, was disastrous to the defendants. There was almost a complete boycott of their products. To hold that there was no liability for damages caused by this conduct, though lawful in itself, would permit a monopolizer to smother every potential competitor with litigation before it had an opportunity to be otherwise caught in its tentacles and leave the competitor without a remedy." [16]

Substantially the same issue is present in petitioner's complaint in the respondent court and we think that the court cannot avoid a decision of that issue no matter what the state court decision may turn out to be.

Another case which lends support to our view that it is the federal court which must decide the issue of fact between these parties is Lyons v. Westinghouse Electric Corp., 2 Cir., 222 F.2d 184. The facts there were very similar to those present here. Lyons brought a treble damage suit against Westinghouse Electric on a claim for damages arising out of a conspiracy in violation of the antitrust Acts. Before that action was brought Westinghouse had sued Lyons in the state court demanding that Lyons account for breach of contract made with Westinghouse as its agents for the sale of electric lamps. One of the defenses pleaded in the state court action was that Westinghouse and General Electric had entered into the same conspiracy to restrain competition in the marketing of lamps. The state court then filed its decision against Lyons di-

recting it to account as agent for Westinghouse, and found that the "defense of illegality, based upon violation of antitrust laws, has neither been sustained nor established." An appeal from that decision was pending at the time the United States Court of Appeals decision was handed down. The federal district court in which the treble damage suit was brought made an order staying all further proceedings in the prosecution of that action pending final determination of the state court action. The Court of Appeals directed the issuance of the writ of mandamus to the district court directing it to vacate the stay.

The court held that the state court had the right to entertain and pass upon the defense pleaded in the state court action to the effect that the transactions alleged in the complaint in that action had been in pursuance of a contract that violated the antitrust Act. Nevertheless it held that the refusal of the district court to proceed with the treble damage suit was not authorized by law and that mandamus would issue ordering it to vacate the stay and to proceed in due course with the trial.

The opinion of the court, (there was a dissent), is predicated upon the court's conclusion that the judgment of the state court finding no violation of the antitrust Act would not operate as an estoppel upon the trial of the treble damage suit in the federal court. The opinion states (p. 189): "In the case at bar it appears to us that the grant to the district courts of exclusive jurisdiction over the action for treble damages should be taken to imply an immunity of their decisions from any prejudgment elsewhere; at least on occasions, like those at bar, where the putative estoppel includes the whole nexus of facts that makes up the wrong. The remedy provided is not solely civil; two thirds of the recovery is not remedial and inevitably presupposes a punitive

16. Compare with Kobe the following from Fashion Originators' Guild v. Federal Trade Comm., 312 U.S. 457, 468, 61 S.Ct. 703, 708, 85 L.Ed. 949: "[E]ven if copying were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law."

purpose. It is like a qui tam action, except that the plaintiff keeps all the penalty, instead of sharing it with the sovereign. There are sound reasons for assuming that such recovery should not be subject to the determinations of state courts. It was part of the effort to prevent monopoly and restraints of commerce; and it was natural to wish it to be uniformly administered, being national in scope. Relief by certiorari would still exist, it is true; but that is a remedy burdensome to litigants and to the Supreme Court, already charged with enough. Obviously, an administration of the Acts, at once effective and uniform, would best be accomplished by an untrammeled jurisdiction of the federal courts." The court held that the final judgment of the state court "can have no effect upon the decision of the action at bar."

If we accept this hypothesis that in the present case no decision of the state court upon the validity of the defense of violation of the antitrust Act, pleaded in that court, can operate as an estoppel when the treble damage suit is heard before the respondent Judge, then of course it is clear that the decision in the state court can in no manner have any effect upon the outcome of the treble damage suit. In making the order the respondent Judge appeared to be of the opinion that if the state court enjoined Mach-Tronics from manufacturing and selling the MVR–10 video-tape recorder and awarded Ampex damages for past sales, the damages recoverable in the treble damage suit would be substantially reduced, if not eliminated.

As we have noted, if the decision in the Kobe case, supra, is based upon correct principles, and if the respondent court should make findings here similar to those in the Kobe case, the suggestion that the decision of the state court would affect the amount of damages is plainly wrong. But whether the respondent's views were right or wrong, the federal court must ultimately try the treble-damage action.

It seems obvious that the court in Lyons was concerned with determining whether the interlocutory judgment in the state court holding that the "defense of illegality, based upon violation of antitrust laws, has neither been sustained nor established," would operate as an estoppel in the action in the federal court because of its bearing upon whether it could be said that proceeding with the treble damage suit in the federal court could accomplish anything against such an estoppel.[17] The court was dealing with a state court judgment which had already been entered. The court knew that the state court had found against the antitrust violation claim and that the state court judgment would become final as soon as accounting had been had and damages ascertained. It was natural therefore that the court there should be concerned with the problem of estoppel.

In the present case we find no necessity of determining finally whether an adverse judgment of the state court with respect to petitioner's pleaded defense of antitrust violation would or would not operate as an estoppel if it should develop that the state court decision was rendered prior to the disposition of the treble damage suit. If it would not operate as such an estoppel for the reasons set forth in the language we have quoted above from the Lyons case, then it would follow that the state court judgment could have no effect whatever upon the treble damage suit in the federal court.

But let us suppose that such a determination in the state court would operate as an estoppel. That in our view would constitute an additional reason for the respondent court to proceed without delay

---

17. In his opinion on petition for rehearing Judge Hand indicated that after studying Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752, he had concluded that it would be possible for findings of fact in the state court to operate as an estoppel in the action in the federal court and thus put an end to plaintiff's claim. He went on to conclude that the particular state court judgment there involved could have no such effect.

with the hearing and determination of the case presented by petitioner's complaint. It would seem to us to be unthinkable that a federal court having exclusive jurisdiction of a treble damage antitrust suit would tie its own hands by a stay of this kind in order to permit a judge of a state court, without a jury, to make a determination which would rob the federal court of full power to determine all of the fact issues before it.

This would fly in the face of the federal policy of entrusting the determination of such treble damage suits exclusively to the federal courts. It would operate to destroy what Judge Hand called, in the words above quoted, "an untrammeled jurisdiction of the federal courts."

The situation we have here has some relation to the problem which arises when a federal court is called upon to determine whether a state prisoner has been denied a federal right and where the federal court has been confronted with findings of fact by the state court holding that such denial has not occurred.[18] In relation to that situation the Supreme Court said in Stein v. New York, 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522: "Of course, this Court cannot allow itself to be completely bound by state court determination of any issue essential to the decision of a claim of federal right, else federal law could be frustrated by distorted fact finding."

In Propper v. Clark, supra, the Supreme Court held that a suggested abstention by the federal court would be improper. The case in the federal court concerned the right of the alien property custodian to certain debts owed to an Austrian national. One of the questions in the case was whether a temporary receiver appointed by state court acquired title to the claim for the debt. It was suggested that the district court should be directed to hold its case until the parties had secured from the courts of New York a decision as to whether such a temporary receiver took title under state law. Holding that nothing in the situation required such abstention, the Supreme Court added as a further reason for not abstaining, the danger that the federal court might find itself blocked by res judicata. Said the court (337 U.S. p. 491, 69 S.Ct. p. 1344): "Furthermore, as the state court could reasonably require complete adjudication of the controversy, the District Court would perhaps be compelled to stay proceedings in the state court to protect its own jurisdiction. 28 U.S.C. § 2283. Otherwise, in sending a fragment of the litigation to a state court, the federal court might find itself blocked by res judicata, with the result that the entire federal controversy would be ousted from the federal courts, where it was placed by Congress."

For similar reasons it is inconceivable that the respondent court here would by staying its hand, as here attempted, permit itself to drift into a situation where a substantial portion of its power to determine the facts through submission of the case to a jury would be frittered away by determination in a state court. (Note the quotation from Beacon Theatres v. Westover, supra.)

The rule that the court which first acquires jurisdiction shall proceed without interference from a court of another jurisdiction is one which applies only in actions in rem. Neither action here is of that character. Kline v. Burke Construction Company, 260 U.S. 226, 235, 43 S.Ct. 79, 67 L.Ed. 226.

Respondent cites and relies upon Chronicle Publishing v. National Broadcasting, 9 Cir., 294 F.2d 744.[19] We think that case has no resemblance to the case

---

18. The typical case is one where the state prisoner alleges state use of coerced confessions and the state court has held that there was no coercion. See Cranor v. Gonzales, 9 Cir., 226 F.2d 83 and Rogers v. Richmond, 357 U.S. 220, 78 S.Ct. 1365, 2 L.Ed.2d 1361.

19. In that case, Chronicle, owner of a television station which had been an outlet for NBC programs, alleged that the defendant broadcasting company was about to acquire another local television station and make it the NBC outlet, to Chronicle's loss. It alleged that the

at bar. The stay there was in no sense concerned with any deference to proceedings in a state court. It dealt solely with federal public policy and the public and private interests sought to be served by federal law. We think that the decision rested upon the principles expressed in Best v. Humboldt Placer Mining Co., 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350.

In that case respondents were claiming an unpatented mining claim and they were seeking in the district court to procure an adjudication of the validity of their claim and to enjoin officials of the Department of the Interior from proceeding with certain administrative action. This administrative action or proceeding was going forward pursuant to statute authorizing administrative determination of the validity of mining claims. In holding that the action in the district court could not properly be maintained while this administrative proceeding was going forward, the Court expressed the congressional policy there involved as follows: "Congress has entrusted the Department of the Interior with the management of the public domain and prescribed the process by which claims against the public domain may be perfected. The United States, which holds legal title to the lands, plainly can prescribe the procedure which any claimant must follow to acquire rights in the public sector." Accordingly the court concluded that the district court acted properly in holding its hand "until the issue of the validity of the claims [had]

been resolved by the agency entrusted by Congress with the task." In short, the court was merely determining what the congressional policy was—that administrative determination should precede adjudication in the courts. In that respect it resembles our holding in the Chronical case.[20]

We have noted here the congressional policy to entrust to the federal district courts the determination of questions of fact and law in treble damage suits brought pursuant to § 15. We think it to be a part of our function to see that this policy, entrusted to the courts, is not frustrated or abandoned.

The propriety of the remedy by way of mandamus cannot be questioned for it is in aid of our ultimate jurisdiction on appeal. McClellan v. Carland, supra; Lyons v. Westinghouse Electric Corporation, supra.

After reading the dissent we add the following:

When a district court decides to abstain it may dismiss the suit, as in Allegheny County v. Frank Mashuda Company, supra, or grant a stay, as in McClellan v. Carland, supra. To the litigant, entitled to be heard, the effect is the same, and just as disastrous to his rights. We note that the Supreme Court's disapproval of abstention in cases previously decided has in no instance been dependent on whether there was dismissal or stay.

The dissent makes clear where our difference lies. Judge Duniway thinks that

---

broadcasting company had in violation of the Sherman Act engaged in a course of conduct designed to suppress competition in the sale of program broadcast time; that the proposed acquisition would tend to substantially lessen competition in violation of § 7 of the Clayton Act, 15 U.S. C. § 18. It appeared that before the broadcasting company could acquire another station it was required to secure the approval of the Federal Communications Commission and proceedings for that purpose were pending there. The trial court stayed the antitrust action pending the Federal Communications Commission's determination of the propriety of the proposed acquisition. It was noted that if

the Communications Commission denied permission for the acquisition, Chronicle's main concern, which was the proposed acquisition, would be satisfied. The stay order of the district court was sustained.

20. Had the court found in the Chronicle case that the congressional policy had been to entrust to the courts the determination of the questions involved, then an opposite result would no doubt have been reached, as in the case of California v. Fed. Power Comm., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54, where the Court speaks of its function: "[T]o see that the policy entrusted to the courts is not frustrated by an administrative agency."

the trial judge "had a feeling" as to the lack of merits of the antitrust charges; that the trial court "may feel" that it is being used for purely tactical purposes, and that it may grant a stay based upon such "feel" or "hunch".[21] It is our position that judicial action should not be based on "feelings" before trial, but rather that judicial action may properly be taken only after evidence, hearing, and findings.

The cases cited in the dissent are not apposite. The case of Butler v. Judge of United States District Court, 9 Cir., 116 F.2d 1013, was, as the opinion shows, an action in rem where applicable was the rule stated in Hutchins v. Pacific Mut. Life Ins. Co., 9 Cir., 97 F.2d 58, 60, and the numerous cases there cited. The same is true of United States v. Adamant Co., 9 Cir., 197 F.2d 1, where though the federal court proceeding was referred to, (questionably), as a personal action, the pending state actions were in rem, dealing with interests in oil production held to be interests in real property.

As for the second circuit decision in Mottolese v. Kaufman, 2 Cir., 176 F.2d 301, we notice that in P. Beiersdorf & Co. v. McGohey, 2 Cir., 187 F.2d 14, two of the three judges there thought Mottolese wrongly decided. But whatever may be the status of Mottolese in the second circuit, the conclusive answer that it cannot be applied, even there, in a case like the one before us is furnished by that court's decision in Lyons v. Westinghouse, supra.

It Is Ordered that the writ of mandamus be issued commanding the respondent Judge to vacate and set aside the said order of October 16, 1962.

DUNIWAY, Circuit Judge (dissenting).

I dissent. I have no quarrel with most of Judge POPE'S careful and scholarly opinion. However, much of it seems irrelevant to the case before us, and it does not convince me that Judge Zirpoli did not have discretion to do what he did.

The order that was actually entered reads as follows:

"It is therefore ordered that all further proceedings in this action be and hereby are stayed until completion of all proceedings in the trial court in the action entitled Ampex Corporation v. Mach-Tronics, Incorporated et al, Docket No. 99838, now pending in the Superior Court of the State of California, in and for the County of San Mateo, or until further order of this court." (Emphasis added.)

It is important to note what the court did not do as well as what it did do. It did not refuse to exercise its jurisdiction. On the contrary, it merely postponed that exercise, not until the California state court decision might become final, but only until the conclusion of proceedings in that case in the trial court. Moreover, it did not make an order which purported to shut off any application by Mach-Tronics for leave to proceed sooner if the circumstances warranted it. On the contrary, the stay recites that it is until the further order of the court. This is no abandonment of the court's control over the conduct of the case.

The court's order also indicates that the court was not applying the doctrine of abstention with which so much of Judge POPE'S opinion is concerned. It did not relegate Mach-Tronics to the state court for the determination of some unsettled state constitutional question or question of state law. Judge POPE seems to me to have erected a straw man and then proceeded very effectively to demolish him. To me, it does not follow that the various cases cited by Judge POPE embody the only situations in which a district judge may stay proceedings temporarily, pending decision of a state court action. Exceptions to the general rule, that a federal court should proceed with a case of which it has jurisdiction, are necessarily worked out case

21. As we indicated in footnote 15, supra, the trial judge in Lyons v. Westinghouse, supra, acted upon such a "feel" or "hunch". But mandamus issued.

by case. Thus, the lack of a prior reported case just like the one before us is not, to me, at all persuasive that here the judge either lacked or abused discretion.

Judge Zirpoli had before him the pleadings in the state case and the complaint in the federal case. It is unverified, and contains some four pages of the usual boiler plate that appears in antitrust suits, all of which can readily be constructed by any competent attorney from the precedents. It charges a conspiracy between Ampex and Radio Corporation of America to monopolize, worldwide, the manufacture and distribution of video tape recorders. However, it does not name Radio Corporation of America as a defendant. The sole defendant is Ampex. The only allegation as to any way in which the alleged worldwide conspiracy affects Mach-Tronics is a charge that Ampex conspired to destroy Mach-Tronics by agreeing to bring and actually instituting baseless litigation against Mach-Tronics falsely alleging that Mach-Tronics had appropriated Ampex's research and ideas. There is a further charge that Ampex, (but not, so far as is alleged, Radio Corporation of America) has "contacted" plaintiff's potential customers and suppliers and falsely represented that the courts had decided the litigation in favor of Ampex, and has threatened them with *economic reprisal if they dealt with Mach-Tronics.* Nowhere in the complaint, or in the affidavits filed in opposition to the motion to stay proceedings, is there any allegation of any facts supporting the charge that a conspiracy of the type described in the complaint actually exists. All of the allegations have to do with the conduct of Ampex alone in bringing the state action and with certain statements claimed to have been made by some of its representatives, or in newspaper articles, as to Ampex's claimed success in the state litigation.

The nature of the state case is fully set out in Judge POPE'S opinion. The circumstances stated in the complaint and admitted in the answer indicate that there is a real possibility that the case is anything but "baseless."

Nothing is easier than to draw an unverified complaint charging a nationwide or worldwide conspiracy by two large corporations to violate the antitrust laws. I think that the court, from an examination of the pleadings, could well have had a feeling that the probability is that there is nothing to the antitrust charges contained in the federal complaint, however well pleaded they may be, and that the filing of the antitrust complaint in the federal court was merely a device to get into that court and to prevent the state court from proceeding with the state case, of which it admittedly had jursidiction. By this I do not mean that the federal court would enjoin the prosecution of the state case. I mean that prosecution of the federal case, with the elaborate and expensive discovery proceedings typical in such cases, would, as a practical matter, stop the state case. Under the theory of Judge POPE'S opinion, it is obvious that complaints to the federal court about the effect of such procedures upon the state case would have to be given short shrift by the federal court. A federal court is not, in my judgment, compelled to allow itself to be used in that manner. All that the court did was to postpone proceedings in the federal case until the state case is tried. What better method can there be of determining whether that case is "baseless" as it is alleged to be in the antitrust complaint? A trial of that issue by a court before which the action is not pending is a peculiar way to determine whether the action has merit.

This is not the first case, nor will it be the last, in which a trial court may feel that it is being used for purely tactical purposes in order to defeat what may be a perfectly legitimate action pending in another court. I think that it is strange doctrine to say that a trial court cannot protect itself from being so used by postponing action until the court before which the litigation was first instituted has a chance to try the case. It may happen that, following decision in

the state court, the pending antitrust case will be quietly dropped. The only way to find out is to abide the event in the state court.[1]

I do not think that any case cited in Judge POPE'S opinion holds that a court does not have discretion to order a postponement under these circumstances, and there are a number of cases which, although not squarely in point, seem to me, on principle, to support what Judge Zirpoli did.

In 1941, this Court, in Butler v. Judge of United States District Court, 9 Cir., 116 F.2d 1013, held that a district judge has discretion to postpone trial of an action, of which the federal court admittedly had jurisdiction, until decision in a prior action in the state courts, involving substantially the same question. The federal case was a diversity case, to quiet title. The state action was to enjoin trespass upon the same property, in which the defendants (one of whom was plaintiff in the federal action) had cross-complained to quiet title. We held that the trial court did have discretion to postpone, emphasizing the fact that title to real property, peculiarly a local matter, was involved. We also emphasized the duty of the federal courts to avoid unseemly conflict with state courts. In this respect, we followed the views of Justice Cardozo in Landis v. North American Co., 1936, 299 U.S. 248, 254–255, 57 S.Ct. 163, 81 L.Ed. 153. We said:

"We hold that the trial court had the discretion to stay proceedings before it pending the prompt determination of the same issue in the state court in an action brought prior to the action in the federal court." (Id. 116 F.2d at 1016)

We also held that discretion had not been abused, pointing out, among other things, the duplication in effort and expense that would arise if both actions were to proceed simultaneously because the rights involved "depend in part upon the conditions hundreds and even thousands of feet underground." And we emphasized the fact that the trial court can "modify its order to meet the situation as it develops."

The situation in Butler is analogous to the situation here, in that a question to be decided in both courts is whether Mach-Tronics has stolen Ampex's trade secrets, in a highly technical field in which inspection of devices and much detailed scientific evidence would be required. The duplication of expense and effort in proceedings for discovery and inspection and trial could be very great. Discovery proceedings, which are substantially the same under California law (see Cal.Code Civ.Proc. §§ 2016–2035) as under the Federal Rules of Civil Procedure, were well under way in the state court, having been carried by Mach-Tronics through the California Supreme Court in an endeavor to prevent inspection of its devices, when Mach-Tronics undertook discovery proceedings in the federal court. The situation in Butler differs from the situation here in that the federal court has exclusive jurisdiction of an action for treble damages under the antitrust laws. But I think a rule that this, in and of itself, deprives the trial court of discretion to postpone action, is a bad rule, and may encourage the bringing of strike suits for the sole purpose of defeating legitimate actions in state courts. Yet this is what I think Judge POPE'S opinion requires.

[1] It may be argued that my views would permit the trial court to pre-judge the merits of both cases upon the pleadings alone, or that I, too, am so pre-judging. But this is not so. A competent trial judge often gets a "feel" of the case at an early stage. I think that he can act upon it, if he does so in a way that is well calculated to determine whether his hunch is well founded while at the same time preserving all parties' rights. That is

what Judge Zirpoli's action does. It permits determination, on the merits, of a key question, namely, is the state action "baseless," in the most appropriate manner, by a trial of that action. At the same time, it retains jurisdiction of the federal case for ultimate determination on its merits, at a time to be determined in the light of developments, by the federal court.

Butler cites and follows a comparable decision of this Court in 1916, Wolf v. District Court, 9 Cir., 235 F. 69. See also Hennessy v. Tacoma Smelting & Ref. Co., 9 Cir., 1904, 129 F. 40; In re Lasserot, 9 Cir., 1917, 240 F. 325; compare: CMAX, Inc. v. Hall, 9 Cir., 1962, 300 F.2d 265.

Another pertinent decision is United States v. Adamant Co., 9 Cir., 1952, 197 F.2d 1, 12–13, in which we remanded with directions to stay execution of a judgment until certain litigation between the parties in the state courts was completed, although both actions were in personam, so that admittedly the state and federal courts both had jurisdiction. We based our decision on considerations of comity, saying:

"Despite the right of federal courts to deal concurrently with personal rights, as a matter of comity, when the state court has acquired jurisdiction there should be no interference by the federal courts until the state action has been disposed of."

Other circuits have handed down similar decisions. In Mottolese v. Kaufman, 2 Cir., 1949, 176 F.2d 301, it was held proper for the district court to stay proceedings in a stockholder's derivative suit, pending the determination of a prior state action. The court cited our decision in Butler. The Mottolese decision was later followed in P. Beiersdorf & Co. v. McGohey, 2 Cir., 1951, 187 F.2d 14, a trademark case. In Milk Drivers Union v. Dairymen's League Co-op. Ass'n, 2 Cir., 1962, 304 F.2d 913, a similar result was reached in an action to compel arbitration, when a prior state action seeking similar relief was pending. See also dicta in Ballantine Brooks, Inc. v. Capital Distrib. Co., 2 Cir., 1962, 302 F.2d 17, 19, and Ferguson v. Tabah, 2 Cir., 1961, 288 F.2d 665, 672.

Jewell v. Davies, 6 Cir., 1951, 192 F.2d 670, upheld a stay because of pendency of a prior state action in a case involving title to church property. The court said: "The district court of course had jurisdiction over petitioner's case and it therefore had the power to make the stay order. This is true because the power to make the order is incidental to the power of the court to control the disposition of the case on its docket. This power is not affected by the fact that the parties in the two causes are not exactly the same or that the issues in each were not identical."

Compare: Ray v. Hasley, 5 Cir., 1954, 214 F.2d 366; Southern Pac. Co. v. Klinge, 10 Cir., 1933, 65 F.2d 85.

I cite the foregoing authorities, not because they are factually in point, but because they all stand for the proposition that a federal district court does have some discretion to postpone proceedings in a case of which it has jurisdiction, pending the prosecution of a pending state court case involving at least some of the same parties and some of the same facts. Unlike the majority, I think that such discretion exists here, and that the judge did not abuse that discretion.

I would deny the writ.